# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
*Jennifer L. Brown
Attorney-in-Charge*

September 21, 2021

**BY ECF AND BY EMAIL**
Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   **United States v. Bryant Brown,
      20 Cr. 12 (PAE)**

Dear Judge Engelmayer:

Bryant Brown set out to rob Albendris Nuñez, not to kill him, when he walked into Devoe Park on the morning of December 20, 2015. He had turned 21 years old less than two weeks prior, and he had never committed a gunpoint robbery before. He had acquired the gun now in his waistband, his first, a .32 magnum double-action revolver, a few weeks earlier, but he had only just found bullets for it. He needed bullets to rob drug dealers because they could be armed, too.

Albendris Nuñez was already there when Bryant arrived at the basketball court in Devoe Park. He was 21 years old, too, and had come to sell Bryant three ounces of marijuana for $600. Repackaged and sold piecemeal, it was worth maybe $900. Two other young men were standing near the basketball court; Bryant believed they were with Albendris. Bryant and Albendris agreed to make the exchange in the bathroom.

Bryant recalls feeling nauseous as he walked into the bathroom with Albendris Nunez. He was nervous, and he was alone: a friend who was supposed to join him had been unable to come.

Albendris stood inside the bathroom door and showed Bryant the marijuana. Bryant stood closer to the stalls. He pretended to be reaching for his money but drew out the revolver instead and pointed it at Albendris. In that moment, Albendris made a sudden movement and Bryant pulled the trigger. "It was a reaction," Bryant says, "I can't tell you why."

Bryant lives in the slow seconds of the incident and replays them often in his mind.  He now believes that Albendris moved because he was startled by the gun, scared and turning to flee.  Bryant wonders if he'd stayed home or even if the gun hadn't been loaded what he'd be doing with his children right now.  After firing, Albendris staggered out of the bathroom toward the two men, but they ran away. Bryant fled to a friend's apartment, deeply shaken.  He found out he had killed Albendris when he was watching the Channel 12 News later that night.

## BACKGROUND

The Devoe Park tragedy was not inevitable.  Bryant is an intelligent and sensitive young man equipped for much better things than committing robberies. Still only 26 years old and two-and-a-half years into his first period of imprisonment, he feels intense remorse for his actions and struggles to recognize his thinking just a few years earlier.  He writes in his letter to Your Honor:  "I am responsible for robberies and a tragedy.  I was acting in a way that was thoughtless and dangerous to myself and to others, seeking short term profit instead of building a stable and meaningful life. . . . Not a day goes by where I don't regret my decisions, and not because I'm incarcerated but because a man's life was taken short. He can no longer have kids or grow old and I'm ashamed of myself for being the person responsible."  **Exhibit 1** at 1.

### Bryant's Unsettled Childhood

As explained more fully in Lauren Harris's detailed mitigation report (**Exhibit 2**), Bryant's childhood was marred by poverty, racism, and instability. Born in December 1994, Bryant is the oldest of 6 children born to Chanel Brown and Biran Laye.  Chanel was still experiencing her own difficult childhood when Bryant was born.  She was 14 when she conceived him, 15 when he was born.  Her father had died when she was 11, and her mother was addicted to heroin.  Biran was an older teenager, an immigrant from Senegal.

Bryant's family was desperately poor.  Biran's modest job as an auto mechanic provided the only income for their large family.  They had trouble paying rent and consequently moved often, sometimes twice a year, and had to rely on the shelter system.  Bryant was always trying to fit into a new neighborhood and sometimes a new school.

As a child, Bryant was always the new kid, the one with dark skin, cheap shoes, and a funny home haircut.  The other children bullied him and called him "Africa."  Initially a talented student, Bryant became derailed by the bullying, losing focus and having disciplinary problems when he defended himself.

Honorable Paul A. Engelmayer                              September 21, 2021
United States District Judge                                          Page 3

In high school, Bryant enjoyed a brief respite when his family moved to
Scranton, Pennsylvania, to be near Chanel's sister.  Among the many "what ifs"
that now weigh on his mind, is what if his family had stayed there for more than
one year.  Bryant thrived in Pennsylvania, away from the Bronx.  His grades
improved and he found community on the wrestling team.  He had his own room.
He felt safe; there were no gunshots at night.  But Biran and Chanel struggled to
get established and the family moved back to the Bronx in 2011.

### Bryant's Adolescent Struggles and Offenses

Bryant's return to the Bronx was calamitous.  From a six-bedroom house in
Scranton, the family of eight returned to a one-bedroom unit in a shelter on 241st
Street at White Plains Road.  It was a dangerous neighborhood, and then 17-year-
old Bryant kept his head down to avoid trouble.  He went straight back and forth
between the shelter and his school, trying more to avoid people than to make
friends.  But trouble found him anyway.  Bryant was sitting in class on a day when
there was a shooting at his school.  Bryant was scared and traumatized when he
heard the shot and saw the injured student.  Worse, he was subsequently accused of
the shooting because the shooter was described as a "dark-skinned young male."  He
was arrested in front of everyone at the shelter and spent three days in central
booking before the police let him go.  His teacher had provided an alibi.

After the school shooting and false arrest, Bryant developed a kind of
fatalism.  He no longer felt comfortable in school and he no longer felt comfortable
in the shelter, where everyone had seen him led out in handcuffs.  He found his way
to the streets.  Everyone already thought he was up to no good, so he figured he
might as well get up to no good.  He joined a gang and began engaging in
increasingly reckless and criminal behavior.  He sold drugs.  He stole them, too.

By the time Bryant set out for Devoe Park on December 20, 2015, his world
had changed.  On the bright side, he was in a stable committed relationship with
Samantha Suarez, who had given birth to their first child, ███, in the summer of
2015.  On the other side, his family support had evaporated.  Samantha had moved
into Bryant's family's crowded shelter apartment while pregnant, and there had
been an argument between Samantha and Chanel when ███ was about a month
old.  Bryant can't even remember what the argument was about now.  What he
remembers is that he had taken Samantha's side and that he, Samantha, and
███ left for a walk to cool off after the argument.  They came back ready to make
amends but arrived to find all of their property in garbage bags.  They moved out
and were taken in by Samantha's grandmother near Grand Concourse.

The falling out was a problem not only for Bryant's emotional and residential
stability but also for his finances.  Samantha was home with ███, and Bryant

3

Honorable Paul A. Engelmayer                                    September 21, 2021
United States District Judge                                                Page 4

needed to support them both.  He had been working with his father at Magic Car
Wash & Lube in Brooklyn, carpooling with his father, but that stopped with the rift.
Bryant needed money to support his young family, and, scarred by his own
childhood experience of being bullied for his poverty, he resolved that his son would
want for nothing.  He figured that he could get money most quickly by robbing drug
dealers.  Barely twenty-one years old, he lacked an appreciation of the risks and
consequences.

Bryant wishes every day that he had taken his father's advice and followed
his example.  Biran and his family were poor, but he made an honest living as an
auto mechanic.  He told his son, you have to work for your money.  Bryant
understands now; he writes: "I envy the working man, to become him, to work and
be able to come home to his children after a long day of hard work. There's not a day
that goes by that I don't daydream of being that man." Ex. 1 at 1.

Biran Laye was diagnosed with cancer while Bryant was in federal custody
on this case and died shortly after Bryant entered his guilty plea.  Father and son
were long reconciled and spoke by phone but they had not seen each other since
Bryant's first court date in this matter because of the pandemic.  If Bryant could see
his father one more time, he would tell him, "You were right, and I was wrong."
Bryant relates that he's "lived a regretful life.  I should have been listening to my
father this whole time.  I would probably be at work right now, waiting to clock out."

After he learned that Albendris Nuñez had died, Bryant became seized by the
fear of his own imminent death or imprisonment.  He fled New York and spent
several months in Pennsylvania.  Convinced that the police were looking for him, he
dared come back only for ███████'s first birthday.  He stayed with Samantha in her
grandmother's apartment, and they celebrated the birth of their daughter, ███, in
2017.  Afraid formal employment would help the police to find him, he committed
additional drug robberies.[1]  He justified them with the same kind of fatalism: now
that he had killed a man during a robbery, what did it matter what he did?

### Bryant's Subsequent Growth and Work and His Sincere Remorse

It was not until Bryant's first contacts with the court system that things
began to change.  He was arrested on his 23rd birthday, in December 2017, with the
gun that he'd used to commit the Count Two robbery with Isaiah Cruz the month
before; and two months later he was arrested for selling crack cocaine to an
undercover officer.  Granted bail, Bryant learned that he had not yet been charged
with the 2015 homicide.  Both relieved and chastened, Bryant made the most of his

---

[1] Bryant did not, however, resume committing robberies immediately upon his return.  In this
regard, we note that paragraph 15 of the PSR contains a typo in its third bullet point.  The messages
with "Luis Blunts" are dated July 16, 20*15* (not 20*16*).

4

Honorable Paul A. Engelmayer                                    September 21, 2021
United States District Judge                                                Page 5

new lease on life.  He got a job delivering groceries through Fresh Direct and
subsequently resumed working with his father, then a manager at Lash
Volkswagen in White Plains.  Bryant began as a detailer and was promoted to a
porter.  He heaped love and affection on his kids.[2]

The last two and a half years have brought more rapid change.  Bryant pled
guilty to the state gun charge in April 2019 and self-surrendered to serve a city year
on May 30, 2019.  Scheduled for release on January 22, 2020, Bryant was instead
writted into federal custody and detained at MCC Manhattan from January 2020 to
May 2021 and MDC Brooklyn from May 2021 to present.

"These past months have been hell," Bryant writes.  Ex. 1 at 1.  "From my
emotions for Albendris and his family, to the terminal illnesses in my family and
the time made difficult by the Covid-19 Pandemic restrictions, life hasn't been quite
simple and I am regretful that it will never be."  Id.  But he also finds some good in
his experience.  "I have come a long way from the man who would once commit
crimes for profit. . . . While being incarcerated I have avoided conflict, both verbal
and physical. . . . I feel I have a purpose now, to show you, my family and society
that a man can be rehabilitated, a man can change through incarceration into a
better man and be a helpful member of his community."  Id. at 1–2.

To a degree, Bryant's maturation is biological.  The human brain continues to
develop in important ways between the ages of 21/22 and 26.  It should therefore
come as no surprise that his insight, self-control, and judgment have all improved.

But Bryant's maturation is also ethical.  He is sincerely remorseful for the
harm that he has caused, and he has thought—even dreamed—about it extensively
during the long hours in his cell.  Since his guilty plea in particular, he has become
increasingly open and candid about it, discussing his feelings at length with his
legal team.  He wrote a letter to Albendris Nuñez's family, which we have asked the
government to pass on to them.  The letter is attached as **Exhibit 3**.  It is unedited
by counsel.

## FIFTEEN YEARS IS A SUFFICIENT SENTENCE

The parsimony clause of 18 U.S.C. § 3553(a) applies equally in all cases,
including homicide cases.  The Court must "impose a sentence sufficient, but not

---

[2] Not everything was rosy.  Even as Bryant avoided crime and put in honest work, the Bronx streets
remained dangerous.  He was targeted by a group called the "Grizzlies" in the Grand Concourse
because of his association with 241st Street, and they chased him down while he was buying milk for
████.  After that, and other incidents, Bryant bought his third and last gun, with which he was
caught during a (probably unconstitutional) frisk in late December 2018.  He bought it purely for
protection and never used it in a crime.

Honorable Paul A. Engelmayer                          September 21, 2021
United States District Judge                                       Page 6

greater than necessary, to comply with the purposes" of sentencing set forth in
§3553(a)(2): punishment, deterrence, incapacitation, and rehabilitation. In this
case, those purposes can be satisfied by a sentence of 15 years.

**1.    Punishment**

      The nature and circumstances of Bryant's offenses are undoubtedly very
serious. He stands convicted of two gunpoint drug robberies, one in which he took
the life of Albendris Nuñez and another in which the person he robbed was injured.[3]
But they are mitigated by Bryant's personal history and characteristics: his youth,
his mindset, and his remorse.

      In considering the purpose of punishment, the Court should consider in
particular Bryant's youth and the difficult conditions of his confinement.

**Bryant's Youth**

      Bryant was 21–23 years old when he committed the crimes in this case. He
is 26 years old now. The Supreme Court has time and again recognized "the
mitigating qualities of youth" to be considered at sentencing Miller v. Alabama, 567
U.S. 460, 476 (2012) (holding that mandatory life without parole for juvenile
offenders was unconstitutional in all cases) (internal quotation marks omitted).
"'[Y]outh is more than a chronological fact.' It is a time of immaturity,
irresponsibility, 'impetuousness[,] and recklessness.' It is a moment and 'condition
of life when a person may be most susceptible to influence and to psychological

---

[3] The seller in the November 2017 robbery was injured because he was hit by a car while running
away, not because Bryant struck him with a gun. Without suggesting that the true story is less
serious than the seller's version, we must therefore object to paragraph 22 of the PSR. What really
happened was that both Isaiah Cruz and Bryant were armed, as corroborated in their November 18,
2017 pre-robbery text messages:

      Isaiah: You brining ya Rolex right ?

      Bryant: You know that

      Isaiah: Saydat me 2

      Isaiah: We gon be 2 ICY MOTHAFUVKAS ✓

In the face of two guns, the seller did not punch Bryant in the face, struggle with Bryant while
Bryant pistol whipped him, or run after Bryant and Isaiah. We do not know why he later told
the police those things in May 2020; it was probably to sound tough. But in November 2017,
he reasonably chose to run away. Even the government apparently does not fully credit the
seller's version of events, because it left the struggle and the chase out of the otherwise detailed
narrative it provided to Probation.

      Although Isaiah Cruz chose not to challenge the seller's account at sentencing, he may
have calculated that an account in which he was present while Bryant pistol whipped someone
was better for him than an accurate account, in which he was also armed.

Honorable Paul A. Engelmayer                                    September 21, 2021
United States District Judge                                                Page 7

damage.'  And its 'signature qualities' are all 'transient.'"  Id. (citations omitted).
The Supreme Court noted that these conclusions rest "not only on common sense—
on what 'any parent knows'—but on science and social science as well."  Id. at 471.

"Recent studies on the development of the human brain conclude that the
human brain development may not become complete until the age of twenty-
five . . . ."  Gall v. United States, 552 U.S. 38, 58 (2007) (quoting with approval lower
court's sentencing determination). "The frontal lobes, homes to key components of
the neural circuitry underlying 'executive functions' such as planning, working
memory, and impulse control, are among the last areas of the brain to mature; they
may not be fully developed until halfway through the third decade of life."  Johnson,
et al., Adolescent Maturity and the Brain, J. Adolescent Health 2009, available at
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/.

In 2014, the National Institute of Justice ("NIJ"), the research, development
and evaluation agency of the U.S. Department of Justice, conducted research on
juvenile and young adult offenders and concluded that "young adult offenders ages
18–24 are more similar to juveniles with respect to their offending, maturation and
life circumstances."  See NIJ, From Juvenile Delinquency to Young Adult Offending
(2014), available at https://nij.ojp.gov/topics/articles/juvenile-delinquency-young-
adult-offending.  Recommendations included the establishment of "special courts for
young offenders ages 18–24" and an "'immaturity discount' for young offenders that
would involve a decrease in the severity of penalties, taking into account a young
person's lower maturity and culpability."  Id.

Because punishment and retribution relate to an offender's blameworthiness,
the case for harsh punishment is not as strong with a young person as with an older
adult.  See Montgomery v. Louisiana, 577 U.S. 190, 207 (2016).

## The Conditions of Bryant's Confinement

Also relevant to punishment is the degree to which Bryant has been punished
already.  Bryant had never been imprisoned before he surrendered to the state on
May 30, 2019 to serve a city year on Rikers Island.  He has now been in continuous
custody for 28 months, including 20 months in federal custody, principally at MCC
Manhattan.

In the best of times, the conditions at MCC are harsh.  See, e.g., United
States v. Saldana, 17 Cr. 512, ECF No. 535 at 16–17 (S.D.N.Y. Sept. 10, 2019)
(Wood, J.) ("I am aware the conditions at the MCC are very dreadful, and it is my
intention to give every defendant who has suffered in that way a break because of
that.").  Video evidence has shown rodents, mold and overcrowding in tight
quarters.  Even the Bureau of Prisons acknowledges the unacceptable conditions at

Honorable Paul A. Engelmayer                                        September 21, 2021
United States District Judge                                                    Page 8

MCC; it announced last month that the jail will be closed until improvements can be made.

These already poor conditions became exponentially worse in February 2020, just weeks after Bryant arrived at MCC.  First, MCC locked down completely for more than a week while correctional officers ransacked cells looking for a loaded gun that had been smuggled into the building.  All detainees were confined to their cells 24 hours per day.  All legal and social visiting was suspended.

Bryant was strip-searched, moved to a different cell, and separated from all his property.  (Most of it was never returned.)  He was left with only one jumpsuit, one pair of underwear, and one pair of socks to wear—for a week and a half.  His cell was freezing: there was no heat, no hot water, and his thermals from commissary had been taken never to be returned.

Then, just days after that lockdown ended, the BOP and MCC imposed new restrictions on inmates due to the COVID-19 pandemic.  All social and legal visiting was again canceled, and Bryant was locked in his cell nearly 24 hours per day, with only 30 minutes out on Mondays, Wednesday, and Fridays to take a shower or contact a loved one.  Given the short time out of his cell, and the lines for the phones, Bryant had to choose between a call or a shower.

To eat, Bryant was given only frozen sandwiches for two months.  The sandwiches were still frozen solid when they were distributed at meal times; Bryant had to run them under the sink in his cell to thaw them out.  He ate them cold and soggy.

The lockdown (and the elimination of food service) was supposed to stop the spread of COVID-19 inside MCC.  But we believe that Bryant was infected anyway in late March 2020.  He experienced a fever, cough, and body aches.  It was the early days of the pandemic, and he was absolutely terrified that he was going to die.  MCC quarantined him alone and checked his temperature but did not otherwise treat him.

Throughout his confinement in the BOP, Bryant has witnessed violence by inmates and abuses by staff.[4]  He has seen detainees stab each other over petty things, like a spray bottle for sanitizing a cell.  On these occasions he has done better than simply to avoid conflict, he has often been able to diffuse it.  He also worked as a suicide-watch inmate companion and in the food service.

---

[4] At Christmas 2020, an officer sent Bryant to SHU for having the temerity to ask the officer please not to take extra Christmas food home with him—he was putting it in his backpack—but instead to give it to the detainees on the unit who didn't have family to put money on their commissary account.  Bryant was ultimately cleared of wrongdoing after more than a month in SHU.

Honorable Paul A. Engelmayer                                      September 21, 2021
United States District Judge                                                        Page 9

Because of the extended lockdowns, Bryant did not have a family visit for more than 18 months. He was not able to see his young children or say goodbye in person to his father, who died of cancer in May 2021. He barely got calls with them.

Things improved only slightly when Bryant was transferred to MDC Brooklyn around the time of his father's death. For the last four months—when the institution is not otherwise locked down, as it often is—he has been to get social visits, once per month. Samantha has brought ███ and ███ to see him on different occasions. But 4-year-old ███ 's last visit was difficult because she had to go to the bathroom after waiting to see her father. The bathroom in the visiting room is closed (COVID-19 restrictions, MDC says), and the correctional officers said that if Samantha took ███ out to use the bathroom in the lobby, the visit would be over. ███ chose to hold it to spend the time with her father, but her discomfort put a damper on the visit.

The abnormally harsh conditions of confinement that Bryant has faced and will continue to face go directly to the sentencing purpose of punishment. As this Court has observed in another case:

> Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close. My colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than measured by the calendar. The same logic applies here and then some. Your time in the MCC was way harder than anyone intended when you were detained following your arrest."

Juan Carlos Aracena de Jesus, 20 Cr. 19 (PAE) (July 1, 2020), Tr. 36. Most other judges in this District have reached the same conclusion. See, e.g., United States v. Tiffany Days, 19 Cr. 619 (CM) (Apr. 29, 2021) (concluding that the jail conditions the defendant had experienced were as inhuman as in any Colombian prison). Because Bryant's imprisonment is more punitive than normal, less time is required to punish him.

**2.   Deterrence**

With respect to specific deterrence, the Court should consider that Bryant is serving his first ever period of imprisonment. Courts have recognized that prison has a greater significance for those who have served little or no prison time in the past, and that that should be taken into account at sentencing. E.g., United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001) ("[I]f a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect."). Moreover, the Court should take comfort in Bryant's genuine remorse, expressed

9

Honorable Paul A. Engelmayer                                    September 21, 2021
United States District Judge                                              Page 10

continually to his legal team, as well as in his letter to the Court and to the Nunez
family. Bryant is devastated by what he has done. As noted, when he thinks about
his crimes—which he does every single day—he no longer even recognizes his "old
self." Coming to grips with his conduct, and a commitment to change, serve as the
best indicators that Bryant is well on his way to being specifically deterred.

With respect to general deterrence, the NIJ has recognized that "[i]ncreasing
the severity of punishment does little to deter crime." See NIJ, Five Things About
Deterrence (2016), available at https://nij.ojp.gov/topics/articles/five-things-about-
deterrence. "Research shows clearly that the chance of being caught is a vastly
more effective deterrent than even draconian punishment." Id. This is especially
true for young people because "the same characteristics that render juveniles less
culpable than adults—their immaturity, recklessness, and impetuosity—make them
less likely to consider potential punishment." Montgomery v. Louisiana, 577 U.S.
190, 207 (2016) (internal quotation marks omitted).

**3.    Incapacitation**

Bryant's youth lessens the need for incapacitation, too, "because ordinary
adolescent development diminishes the likelihood that a juvenile offender forever
will be a danger to society." Id. (internal quotation marks omitted). On the
contrary, young men "age out" of criminal activity. The NIJ has noted that "[e]ven
those individuals who commit crimes at the highest rates begin to change their
criminal behavior as they age. The data show a steep decline about age 35." NIJ,
Five Things About Deterrence. If the Court imposes a 15-year sentence, Bryant will
be about 40 when he is released to supervision. Nearly 75% of all violent crime is
committed by individuals younger than 40. See FBI, Crime in the United States
2019, Table 38, available at https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-
u.s.-2019/topic-pages/tables/table-38.

**4.    Rehabilitation**

Finally, Bryant's prospects for rehabilitation are good, and will only diminish
with the length of his sentence. With respect to rehabilitation, the Court should
consider Bryant's sincere remorse, his gainful employment in 2018 and 2019, his
family support and commitment to his children, see Ex. 2 & appended letters of
support, and, of course, his youth. "Indeed, [t]he relevance of youth as a mitigating
factor derives from the fact that the signature qualities of youth are transient; as
individuals mature, the impetuousness and recklessness that may dominate in
younger years can subside." Roper v. Simmons, 543 U.S. 551, 570 (2012) (alteration
in original, internal quotation marks omitted). Through his remorse and reflection,
Bryant demonstrates that he carries the potential of his youth, that is, he has a
"heightened capacity for change." Miller v. Alabama, 567 U.S. 460, 479 (2012).

Honorable Paul A. Engelmayer                                    September 21, 2021
United States District Judge                                                    Page 11

## CONCLUSION

Bryant Brown is a remorseful young man serving his first ever period of
imprisonment under difficult conditions.  Fifteen years is a sufficient sentence.

Sincerely,
 /s/ Clay H. Kaminsky
Clay H. Kaminsky
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8749

Florian Miedel
Miedel & Mysliwiec LLP
80 Broad Street, Suite 1900
New York, NY 10004
(212) 616-3042

*Attorneys for Bryant Brown*

CC:    Counsel of record
       Bryant Brown

# EXHIBIT 1

Dear Honorable Judge Engelmayer,

I want to take this opportunity to address to you personally of my sorrow and some of my emotions and resolutions from the past 28 months being incarcerated. I am responsible for robberies and a tragedy. I was acting in a way that was thoughtless and dangerous to myself and to others, seeking short term profit instead of building a stable and meaningful life. Having had ample time to reflect I have accepted responsibility for these crimes as well as the many other decisions that together led me to such a terrible event. Signing the guilty plea was the first thing I could do towards making reparations to Albrendris's family, to the court and to society. There is no excuse and there could never be enough apologies to right the wrong that I've done. Not a day goes by where I don't regret my decisions, and not because I'm incarcerated but because a man's life was taken short. He can no longer have kids or grow old and I'm ashamed of myself for being the person responsible. These past months have been hell. From my emotions for Albendris and his family, to the terminal illnesses in my family and the time made difficult by the Covid-19 Pandemic restrictions, life hasn't been quite simple and I am regretful that it will never be.

What I can say is that while being incarcerated for the past months it has done some good for me. I am on the right path and I am changing. Now I know you've probably heard this hundreds of times in your years as a judge, but I know as of fact that I'm changing. Through my old text messages pictures it feels as though I'm looking at a different person, a person that been transformed into a real person. Some of the reason for this change is the books I've been reading such as "Relentless Optimism" by Darrin Donnelly. My way of thinking has changed in all. I'm not saying I'm a saint, but I have come a long way from the man who would once commit crimes for a profit. I envy the working man, to become him, to work and be able to come home to his children after a long day of hard work. There's not a day that goes by that I don't daydream of being that man. While being incarcerated I have avoided conflict, both verbal and physical. Just like the outside world, in the institution society there is temptation. Temptation like I followed on the outside. I have learned not only to avoid that temptation but how to resolve conflicts around me. As you may know there is a lot of violence in these institutions especially where I reside, and although I'm not able to stop them all I have resolved a lot of conflicts from getting physical and possibly fatal. I am doing this so when I'm released I can help with the fight on crime and prevent future crimes from occurring by talking to the youth of the community and the adults. They have to know that the life of crime is not the only way and the consequences isn't worth it. My goal is to work in an establishment where I can not only change the lives of today's children but guide them into a better future and ultimately prevent future crimes from even happening like the one we are here in court today, that will break two families apart.

I thank you and I'm grateful that you took the time to read this letter that I've thoughtfully wrote. Growing up I was on the right path, I was involved in school sports, after school activities and extra curricular activities such as mock trials. Up until I got around bad influences and a violent community. Having this incarceration experience, one which I would never want to come

across again has changed me and taught me a valuable lesson. I actually am grateful for this experience for which it is something that changed me and my outlook on life. I feel I have a purpose now, to show you, my family and society that a man can be rehabilitated, a man can change through incarceration into a better man and be a helpful member of his community. I hope that you give me this chance to show you and my community that it is possible that a man can truly change. Thank you.


Sincerely,

Bryant Brown

# EXHIBIT 2



September 21, 2021

Honorable Paul A. Engelmayer
U.S. District Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

   Re:    *United States v. Bryant Brown*, 20 Cr. 00012 (PAE)

        Mitigation Report – Bryant Brown
        Prepared by Lauren Harris, LMSW

## I.  INTRODUCTION

  My name is Lauren Harris, LMSW of Harris Mitigation and I prepared this mitigation report for Bryant Brown at the request of Clay Kaminsky, Esq. and Florian Miedel, Esq. The goal of this report is to provide the Court with a psychosocial history, as well as highlight important factors that go to sentencing and rehabilitation.

  Harris Mitigation provides mitigation and sentencing advocacy to law firms and public defenders. I am trained as a mitigation specialist and specialize in gathering social histories to develop in-depth narratives describing the life experiences of clients in both state and federal court. Further expertise focuses on assessing adolescents in the criminal legal system, designing programmatic alternatives to incarceration that address underlying issues, and addressing the holistic community re-entry needs of individuals.[1] In my career, I have worked with hundreds of clients in various jurisdictions. These clients have faced allegations ranging from cannabis possession to homicide.

  Please note that this report is not meant to minimize or excuse the actions of Bryant Brown that bring him into contact with the criminal legal system. The goal of this report is for the Court to have a deeper understanding of Bryant, the emotional and social factors that contributed to his contact with the legal system, and perhaps most importantly, the changes he has undergone through the pendency of the case – changes that evince rehabilitation and go directly to the request for a below guidelines sentence.

## II. PROCESS

In preparation of this report, the undersigned mitigation specialist interviewed the following individuals, either by telephone or in person:

- Bryant Brown
- Samantha Suarez (former partner)

---

[1] See Appendix A for my curriculum vitae.

- Chanel Laye (mother)
- Patricia Laye (sister)

In preparation of this report, the undersigned mitigation specialist reviewed the following documents:

- New York City Department of Education academic records
- Jacobi Hospital medical records
- Bronx-Lebanon medical records
- Federal Bureau of Prisons medical records
- Correctional Health Services records

## III.  SOCIAL HISTORY

Bryant Brown was the first child born to Chanel Brown and Biran Laye. While Bryant's parents loved him very much and were committed to one another, Bryant's entrance into their lives served to cement their struggle as young parents with limited finances.

Chanel Brown was surprised to find herself a mother at the age of 15 – less due to her age, but because she never wanted to be one. While her early years were stable, her adolescence was characterized by the loss of her parents in very different ways. When she was 11, her father died suddenly of a brain aneurysm, plunging her family into grief and chaos. In order to cope with her depression, Chanel's mother Patricia started using heroin, which impacted her ability to parent. While Chanel is quick to state the family never went hungry and always had clothing, her mother was emotionally unavailable due to her struggles with addiction as Chanel navigated her adolescence.

Just two years after her father's death, Chanel met Biran Laye, a 17-year-old newly arrived from Senegal. Biran had come to the United States in order to support his family, though that plan was ultimately derailed by meeting Chanel. The two were introduced through mutual friends when Chanel was 13 years old. She was immediately drawn to the older male presence, as well as the promise of family their relationship offered. While Chanel's family disapproved of their relationship, there was little anyone had the capacity to do as she moved into Biran's rented room and soon became pregnant at 14. Bryant was born on December 7, 1994. Given Chanel's age, Bryant was raised in part by his grandmother Patricia, and he and Chanel grew up parallel to one another, rather than in a more traditional parent-child dynamic. Bryant called Chanel by her first name, not mom. "That was my little brother," she says, reflecting on her early years as a parent.  Just two years later, Bryant's sister Fatou was born. In an effort to ameliorate their housing insecurity, Biran and Chanel married, [2] and the family entered the shelter system, living in a squalid set of rooms on Boynton Avenue.

---

[2] Bryant is the only child who has his mother's surname, as Chanel's mother discouraged her from giving Bryant his father's surname. The concern was his father would take Bryant back to his native Senegal, and the family would have no legal recourse for his return.

While his initial experience in the shelter system failed to register with five-year-old Bryant, as he



aged, he felt the family's financial strain more acutely. The family moved often, sometimes after only six months in a residence, and never living longer than a couple of years in any given place. These moves were always precipitated by the family's inability to pay rent, and each time featured dysregulation and an adjustment to a new space, a new school, a new set of neighborhood factors to navigate. Bryant recalls a friend he's since lost touch with who has lived in the same home since Kindergarten. "People who lived at the same address since birth – I've always envied that." These frequent moves engendered Bryant's sense of insecurity in his immediate home, and this insecurity also extended outside of it. The absence of a familiar neighborhood and its attendant friend group meant social isolation.

The residences the family found themselves in never had enough space for the family; in the final shelter placement Bryant resided in with his family, he and his five siblings shared the sole bedroom while his parents slept on a futon in the living room. Perhaps more stifling than the living conditions was the lack of agency they experienced as residents in the shelter system, living at the mercy of the Department of Homeless Services: "With the shelter, the city could always decide when to move us," Bryant says. The family could only afford to rent throughout the Bronx, which often meant living in neighborhoods where community violence and the illegal drug trade were endemic. As a result, Chanel often forced her children to remain indoors, something she understands negatively impacted them but defends, having seen so many young people succumb to the streets. "I was trying to be protective," she says. "Every night on the news you see something. What makes you think it won't be your kids?"

A.  Racism & Bullying

Up until early adolescence, school offered a reprieve for Bryant from the chaos of home. Despite frequent moves his family managed to keep Bryant in the same school, and he attended Bronx Little School from Kindergarten until 5th grade, excelling in math and science. Unfortunately, Bryant's entrance into middle school signaled the start of constant bullying and physical violence. As a 12-year-old, Bryant was forced to allocate his energy toward protecting himself, rather than learning and growing in a safe, supportive environment.



Around this time, Bryant was sent to The Gambia and Senegal for two months to visit his father's family. The family made the decision to send Bryant and his sister in order to remove them from the challenges of the Bronx. Bryant recalls being scared of so many things before he arrived at his father's family home: he was afraid his father would trick him by getting him to Africa, then leave him there; he was scared of the plane ride and its length, as he'd never been on a plane before; he was scared of his grandparents, as they spoke no English and Bryant and his sister did not speak Wolof. Once there, however, all his fears fell away. Bryant thrived when presented a different way of life. "Out there it's better. There wasn't any crime [or] guns, and everybody is free to come and go as they please." Bryant specifically remembers seeing his uncles' workshops and visiting Mecca. When it was time to return to the Bronx, Bryant was filled with dread.

While the trip to Africa served as a new context for Bryant to experience himself within, it also served to compound the ridicule he experienced from his peers. Throughout his adolescence Bryant was bullied for two reasons: his family's financial situation and his skin color – two aspects of his identity that have shaped his perception of himself, and ultimately contributed to his current circumstances. While Middle School 302 required uniforms, the students were afforded choice when it came to footwear. Because of Bryant's family's circumstances his shoes were always the least expensive, never the 'right' kind. Similarly, his father would cut his children's hair, cutting Bryant's so low he would initially look bald.[3] While these two features might seem minor, it was the only area of individuation among his peers, and therefore made the ways Bryant appeared differently that much more evident.

More insidious and wounding is the colorist racism that he experienced, and could not help but internalize. Colorism is the belief system within the Black community by which individuals who present with a lighter skin tone experience greater privilege and opportunity to those who have darker complexions.[4] Because of Bryant's dark skin color, he was called "Africa" – an especially hurtful epithet given his father's immigration from Senegal. For an entire year, Bryant was forced to protect himself when the bullying turned physically abusive, frequently ending up in the principal's office and ultimately suspended. It's worth noting that Bryant's skin tone was not only a factor for fellow students, but likely also for school administrators: a 2013 study using data from The National Longitudinal Survey of Youth found that "darker skin tone significantly increased the odds of suspension for African American adolescents."[5] His school suspensions inevitably led to his mother's physical discipline at home, but he

---

[3] At the age of 14, he learned how to cut his own hair, then started cutting his brother's in order to save him from the social stigma Bryant had experienced.

[4] Hunter, M. (2007). The persistent problem of colorism: Skin tone, status, and inequality. *Sociology Compass*, 1(1), 237–254.

[5] Hannon, L., DeFina, R. & Buch, S. (2013). The relationship between skin tone and school suspension for African Americans. *Race and Social Problems* (5), 281-295.

4

never shared what was triggering the fights. Given the fact that Bryant was raised more as a peer than a dependent and due to the stressed circumstances, Bryant tried to protect his parents. There has been extensive study of the long- and short-term effects of bullying; an entire government agency has been dedicated to the topic.[6] The conclusions drawn are painfully familiar to Bryant: bullying can lead to increased feelings of depression and anxiety, and lower engagement in school. Just as important as what Bryant experienced was when it occurred: the years spent as a target of his peers were crucial ones in an adolescent's brain development, and indelible to his perception of himself.

Perhaps most affecting about Bryant's experience is the manner in which he has internalized the colorism, racism and bullying he experienced into his own idea of himself. When asked what someone would be surprised to know about him, he responds quickly: "The look I have, it looks like I'm real mean. Stereotypes are that dark-skinned people are not nice, that they're mean. People that know me and been around me, [they know] I'm a really nice person."

B.  A Brief Reprieve

At the end of his 10th grade year, Bryant's family moved yet again. Bryant's aunt had been living in West Scranton, Pennsylvania, and encouraged the family to move there. While rents were a consideration, Bryant was also struggling to keep himself safe amidst the community violence in their neighborhood on Burnside Avenue. Still, Bryant and his siblings did not welcome another disruptive move.  "I really wasn't too happy about it," Bryant said of his initial reaction. "I had to start all over." It wasn't until Bryant started attending school and making friends that he realized how different life in West Scranton was from the Bronx. "In the Bronx you adapt to the environment. Everything that's going on, the drugs, the gangs and violence, it corrupts you and distracts you and you get sucked into it. Out there, people were doing good and going to school, and once you start doing that, it's actually fun." In the new and safer surroundings, Chanel felt more at ease allowing her children to leave the house and move about unmonitored. Free from channeling so much of his energy and awareness into self-preservation, Bryant joined the wrestling team and started doing mixed martial arts. Bryant's improved quality of life is born out in his transcript as well as his self-report. In the last year he attended school in the Bronx prior to the move, he had a failing average of 60.0442. At the end of his 11th grade year at West Scranton High School, he was passing, with a 70.4242 average.[7]

Socially, Bryant also thrived. He enjoyed the status, less the stress, of being from New York City, and he made friends easily. He describes that while there were not many other students of color in his high school in Pennsylvania, he didn't feel out of place. He enjoyed going to parties that felt age appropriate, riding bikes, and, for the first time in his life, having his own room. While his family lived there, it was a reprieve from the constant safety concerns, and allowed him space to explore his talents and focus on school.

Unfortunately, Bryant's family did not enjoy a similarly positive experience of West Scranton. While Bryant did not report any experience of discrimination in school, Chanel says that the family struggled to find an affordable place to live and ultimately left because of the racism they experienced. She recalls that on more than one occasion, she and her husband would go to see apartments, and while waiting for the landlord to arrive, white neighbors would come outside and stare at them, then spit on the ground. "I couldn't live like that, among that ignorance," Chanel says. What's more, Bryant's father had been unable to find local employment while the family resided in Pennsylvania, so he was commuting across state lines to support the family – a commute that was well over two hours each way. Occasionally Chanel would accompany Biran back to the Bronx to see friends while Bryant and his siblings stayed with their

---

[6] US Department of Health and Human Services, *StopBullying.gov* (last visited September 7, 2021).
[7] See Appendix B for Bryant's transcript.

aunt. On one such trip, Biran and Chanel were on the highway when something fell off the back of a transport truck, and they swerved to avoid it – driving off the road and flipping their car multiple times. To this day, Chanel does not understand how they survived the accident, and she is forever indebted to the individuals who stopped to help. Chanel remembers finding glass in her hair for days after they were released from the hospital. This accident, combined with the continued financial stress and the discomfort Chanel reports the family experiencing, led to the family's decision to return to the Bronx.

Pennsylvania comes up frequently in Bryant's reflections on his life. Like his experience in Africa, he understands how important it was for him to see another way of life, one he had previously not experienced. In Bryant's mind, Pennsylvania serves as a halcyon era. While he is glad for the experience, his recollections are also shaded with melancholy, for the path he might have taken.

C.   A Brutal Reentry

The transition back from Pennsylvania was challenging for myriad reasons. Having relaxed into the safety of their environment in Pennsylvania, Bryant and his siblings suddenly found themselves in one of the worst neighborhoods in New York, where the soundtrack to dusk was provided by gunshots and the illegal drug trade occurred in broad daylight. Bryant can readily list off the major shootings he recalls from the era he lived there, and remembers 241st Street and White Plains Road as the neighborhood corner where gang members congregated – the same corner Bryant and his siblings had to pass to get to school. "There was a lot of violence in the area…[and] no possible way to escape it if you lived there," Bryant describes.

Initially, the family attempted to cope with the terrible neighborhood conditions in the same way they had prior to moving to Pennsylvania: by staying indoors. With her children older and their apartment conditions stifling, though, Chanel struggled to keep her kids inside. Bryant began attending Bronx Regional High School.[8] In order to get to school safely he kept his eyes to the ground, moving quickly past the numerous people calling after him. This was often not enough to allow him to pass unscathed; as a young Black man in that neighborhood, Bryant was assumed to be a part of ongoing conflict, and on multiple occasions he was beaten. Having experienced a life with more ease and opportunity, Bryant was that much more dejected to find himself back in the Bronx. Still, he was committed to finishing school, so that he would be better positioned to help his family.

It was in the initial months of attending 11th grade at Bronx Regional High School that Bryant experienced a terrifying event: a school shooting. He was inside his classroom when he heard a gunshot in the hallway. When he and his classmates rushed to the door to see what had happened, they saw a fellow student clutching his arm and staggering away. Bryant felt confused and scared, and he and a friend left the school grounds immediately, as did many other students. Bryant returned home immediately, unsettled by the day's events. A few hours later, Bryant received a call from the school's principal, letting him know that detectives were coming to question him, as the suspect in the shooting was a "dark-skinned young male."

That night, detectives came to Bryant's family's door. "Two-hundred forty-first street changed my life. Soon as I come back from PA, people seen me walk out in handcuffs." He spent three days in central bookings, with no idea what was happening. He saw people come and go, but he never saw a judge or a lawyer. He describes the experience as "hell. One of the worst experiences of my life." The area he was held in was crowded, and after about a day he began to smell. He didn't eat any of the food. He was able to call his family occasionally, but they knew less than he did about how to navigate the situation. Each

---

[8] While Bryant had wanted to return to Bronx Studio School for Artists and Writers – where he had been attending prior to his move to Pennsylvania – he was placed at Bronx Regional High School.

time he asked someone with authority what was happening, he was told he was "not on the list." On the third day, an officer came and let him out the back door, without even a handing him a Metrocard. He never went into a courtroom, never saw a judge or talked to a lawyer. He called his mother from a payphone, and his family came and picked him up.

Prior to the incident, Bryant had tried to spend as little time outside of their shelter apartment as possible. He didn't make eye contact with people as he went in or out, and he didn't hang out with anyone despite their invitations. "I wasn't making friends. School and back, school and back." Following his arrest at the shelter, all eyes were on Bryant. Compounding the situation was that Bryant felt both unsafe and uncomfortable returning to the school, given the seriousness of the accusations leveled at him. "I didn't want to have nothing to do with that school. I just stopped going." Bryant never attended school in the community again.

It is impossible to disentangle Bryant's false arrest from the racist profiling of Bryant's earlier school experiences, as well as the consistent and corrosive racism Bryant has absorbed over the course of his life. Bryant's middle school experience was a faint echo of what came later in the accusation of his involvement in the school shooting, but it is all of a piece with the theory of the "criminal black man" -- the way in which American culture has inaccurately and devastatingly collapsed the identity of young Black men into criminal involvement.[9] This myth-making has come at the expense of generations of Black men. In Bryant's case, that cost was social support, physical protection and upward mobility.

For Bryant, the school shooting and his subsequent false arrest represent a door closing. What Bryant experienced is a more nuanced – yet no less insidious – version of the school-to-prison pipeline: the pushout theory. The distinction between a pushout student and one who drops out is that the pushout student exists at the nexus of environmental factors within the school (overly harsh disciplinary policies, absence of safety, under-resourced academic environments), whereas the notion of a drop-out student places the onus squarely on the student as a failing.[10] One wonders how Bryant's life might have been different had anyone from the school attempted to reengage him following the incident, or protected him in the first place.

D.   Out of Options and In Need of Social Support

Shortly after his false arrest, Bryant was approached by some young men in his neighborhood who he knew to be involved in a gang, asking him to join. He told them he would consider it but needed time, in an effort to delay. In the week he took to think about it, Bryant felt resistant to their offer, but he also felt trapped. Just a few months prior, he had been on the wrestling team, heading towards his high school diploma and college after that. "I wanted to do something different," Bryant says. Ultimately, though, Bryant worried about his safety, and his siblings. Even going to play basketball Bryant was confronted with hostility and violence. At the time he felt trapped, that there was no place to go that would be safe for him. It was under these circumstances that he accepted their offer.

Once Bryant joined a gang, his behavior decompensated. Bryant recounts that no one in his family said anything to him directly about the change he'd undergone since the school shooting incident, but they must have noticed he was spending more time outside. Once Bryant's father drove by the corner of 241st Street and White Plains Road as Bryant was with a group of people. They made eye contact. His

---

[9] Russell-Brown, K. (1998). The Color of Crime: Racial Hoaxes, White Fear, Black Protectionism, Police Harassment and Other Macroaggressions.

[10] Ecker-Lyster, M. & Niileksela, C. (2016). Keeping students on track to graduate: A synthesis of school dropout trends, prevention, and intervention initiatives. *The Journal of At-Risk Issues, 19*(2), 24-31.

father never said anything to him about who he was with or what he was doing, but Bryant says he must have known something was going on. Increasingly, Bryant would ignore his curfew and his mother, except for when she sent him to his grandmother's house. As previously mentioned, Bryant's grandmother was more akin to a mother to him. For the entirety of his life, Bryant's grandmother had served as a consistent source of unconditional love, and a beacon of affection and attention. By the time Bryant was 8 or 9, his grandmother was in recovery, and he can recall attending her treatment program with her to get her methadone dosage. His grandmother's experience led to frank discussions about substance abuse, and he told her the first time he ever smoked cannabis. She listened non-judgmentally, then offered up some thoughts on how to stay safe. As a teenager, Bryant would travel out to Brooklyn to be with her, sometimes staying for a few days. He loved being around her, so was never tempted to go outside while there.

Bryant's grandmother died from cancer on December 27, 2013. To this day, he is haunted by not seeing her one final time. The loss was devastating for the entire family, but particularly so for Bryant. Notoriously stoic, the only time Chanel has ever seen Bryant cry was when his grandmother died. Her death so impacted him that he decompensated in the wake of her loss, losing weight and not taking care of himself. "His grandmother was a mother to him," his former partner Samantha Suarez says of the loss.

E.   Parenthood As Purpose



The only good thing Bryant carried out of his family's shelter placement on 241st Street is the relationship he had with Samantha Suarez, and his two children ▮▮▮▮ and ▮▮▮▮ When asked what Bryant's greatest accomplishment is, he responds immediately: "My kids." ▮▮▮▮ now 6, is like Bryant: funny, and loves to make people laugh. ▮▮▮▮, 4, is a serious person, eschewing laughing and joking, except when it comes to her brother. "He'll break her, and they'll have their little moments."

While Bryant's former partner Samantha felt unprepared and anxious to be a parent, Bryant welcomed the new role wholeheartedly. Present at both births of his children, he leapt into fatherhood, splitting night feedings with Samantha and acting as their primary caretaker each time Samantha returned to work as a day counselor at AHRC.[11] Just 20 years old when ▮▮▮▮ was born, Bryant and Samantha navigated a terrifying ordeal when ▮▮▮▮ had to remain at Bronx Lebanon Hospital for ten days due to him ingesting meconium during the birth. "I kind of went crazy," Samantha recalls of that period, but

---

[11] AHRC is an organization that supports individuals with intellectual and other developmental disabilities.

Bryant was a supportive, calming presence, committed to caring for the physical and emotional needs of the three of them.

While Bryant fell deeply in love with his son immediately, █████'s birth made the young couple's financial situation that much more dire. As is the case with many people, Bryant's own childhood greatly informed his priorities as a parent. Given the financial strain his family of origin experienced, he never wanted his children to experience the stress he had. Unfortunately, the financial realities set in immediately. Unable to afford their own apartment, Bryant and Samantha moved in with Bryant's parents toward the end of her pregnancy. This living arrangement lasted just four months, until █████ was one month old. An argument arose between Samantha and Chanel, and when the couple left to walk around the block and let tempers cool, they returned to find their possessions in trash bags on the curb. The young family moved into Samantha's grandparents' apartment – a similarly fraught living situation, as Samantha's elderly grandfather disliked the noise and disruption young children can bring. Increasingly, Bryant felt depressed and trapped, responsible for condemning his young son to the same existence of lack and need he had experienced. When Samantha lost her job, she felt the discomfort of their situation as well. It was at this point that Bryant remembers thinking, "I don't want my kids to grow up like this. I don't want to continue life like this…I felt like it was the only way – selling drugs and stealing was the only way to get money."

F.   Barriers to Living A Lawful Life

In the aftermath of shooting Albendris Nunez, Bryant was convinced everything he saw was a sign related to his own imminent death.  He was nervous, leaping up and looking out the window each time a car passed. He went to Brooklyn, then ultimately to Pennsylvania. He lasted six months before returning home for █████'s first birthday, incapable of staying away from his young family. Upon returning to the Bronx, he felt less certain that he was marked for death, but worried that he was wanted by law enforcement. Bryant was thrilled to be back with his family, but he soon began to feel the same financial strain that had led him to the tragic death of Albendris Nunez. The harm he had caused was outweighed in his adolescent mind by the need to support his children. "My main fear was that I didn't want my kids growing up like I did, not having what other kids had," Bryant says.

Running parallel to the financial pressure Bryant felt was a strange alchemy of fatalism and hubris. The shame and remorse Bryant experienced at having taken a life were integrated into his identity, and he began to believe he was a person who would cause harm and support himself through illegal means. With an eleventh-grade education and the belief that he was barred from the legal economy, Bryant felt relegated to making money the only way he knew. Conversely, because Bryant suffered no repercussions for his actions, this served as a type of permission to continue. "I didn't stop doing it until I got caught for it," Bryant says in describing his mindset at the time.

Bryant's inability to accurately assess his actions and their attendant risks was also a feature of his brain development. At the time of the incident, Bryant had just turned 21 years old – four years before the age the scientific community considers the brain to cease development. While Bryant was assessing his next steps and attempting to chart a path for his family, the emotional center of his brain had developed, making him prone to impulsivity and stimuli seeking. Conversely, the prefrontal cortex that governs consequential thinking and regulates self-control had yet to fully develop.[12] The decision to engage in robberies, something he knew to be mortally dangerous, is evidence of this very inability to weigh the consequences of his actions against the perceived rewards. "The adolescent brain is often likened to a car

---

[12] The MacArthur Foundation Research Network on Law and Neuroscience, *How Should Justice Policy Treat Young Offenders?*, http://www.lawneuro.org/adol_dev_brief.pdf (last visited September 7, 2021).

with a fully functioning gas pedal (the reward system) but weak brakes (the prefrontal cortex)."[13] In the summer of 2017, when Bryant was 22 years old, he and Samantha welcomed their daughter ███. They were thrilled at the arrival of a healthy baby girl, but both knew this would further strain their already tenuous circumstances. Bryant's relationship with his family remained fractured since the fight when ███ was one-month old, so the young couple knew they could not seek any type of support – emotional or otherwise – from them.

Bryant first came into contact with the criminal legal system, for possessing a firearm, about six months after ███ was born.  He bailed out, and – realizing there was no warrant out for his arrest for the instant offense – got a job at Fresh Direct in 2018. Unfortunately he was unable to support a family of four on $130 a week, so his father got him a job working with him at Lash Volkswagen in White Plains.

Complicating Bryant's efforts to live a law-abiding life was the very real danger he was in whenever he left the house. Bryant's friend Justin had been killed in an escalating conflict between rival groups. Around the summer of 2018, Bryant was shot at on University Avenue, and understood that he was being targeted to kill. Less than two weeks later, while buying milk for ███, he exited a bodega to find a group of 15-20 people – including the individual who had shot at him. Bryant watched as this individual moved to crouch behind a car while brandishing a gun – a move he knew was a precursor to shots being fired, as the individual was trying to evade cameras. Bryant took off running and was chased into a restaurant where the cook took mercy on him and allowed him to stay in the kitchen. The group out front didn't enter the restaurant, but waited for a while until ultimately dispersing. Two weeks after that, Bryant was attacked while walking with Samantha. Samantha was left out of the conflict, but Bryant was forced to fight multiple individuals during which he believes his jaw to have been fractured. He went to Jacobi Hospital after the fight, but the wait time was lengthy and Bryant left, unwilling to describe how he'd sustained the injury. This succession of incidents made Bryant feel he had no choice but to carry a gun.

When Bryant was arrested at the end of 2018 on another gun charge, the tension between Bryant and his father came to a head, and they had an explosive argument. Deeply frustrated at Bryant's struggles and terrified that his son was carrying a firearm, Biran screamed at him, "What the fuck are you doing? What's wrong with you?" The profanity and raised voice were uncharacteristic of his father, but Bryant shouted back, asking his father what he would have him do, as people are trying to kill him.

For the next several months, between his arrest in late December 2018 until he began his sentence on May 30, 2019, Bryant dedicated himself to the emotional and physical support of his children. He was ultimately sentenced to a year on Rikers Island for his gun cases, and he began his sentence with a certain optimism. Throughout his incarceration at Rikers – his first ever – Bryant and Samantha refined their plan: They would move to either Wisconsin or the Poconos, and remove their children from the Bronx. "There's nothing here for them," Bryant said of their reasoning. Just days before Bryant's planned release, he was taken into federal custody.

While this event was devastating for Bryant and his family, it ultimately led to a full reconciliation with his father. With nothing but time to reflect on why he was where he was, Bryant realized his father had had his best interests in mind all along. "If I could go back, I would follow in his steps. Even if [his income] wasn't enough [to support the family], [he was] stable. He was trying to show me: You're supposed to work for your money. If I had just listened to him, I wouldn't be here right now." Bryant recalls the last time he saw his father alive: in a federal court room as he was being arraigned for murder. The two had spoken by phone minimally during the eight months Bryant had been at Rikers. Given the

---

[13] National Institute on Drug Abuse, *Principals of Adolescent Substance Use Disorder Treatment: A Research-Based Guide*, https://www.drugabuse.gov/publications/principles-adolescent-substance-use-disorder-treatment-research-based-guide/introduction (last visited September 7, 2021).

gravity of the circumstances, though, any past tension fell away.  "The look he gave me, it was a reassuring look. It was 'I got you.'" Between the global pandemic and Biran's cancer diagnosis, Bryant and his father were never in the same room again. Prior to Biran's death, Bryant said goodbye to his father by phone. He wanted him to know that he was taking responsibility for his actions.  "I let him know I was taking the plea, [and] he kept saying 'It's OK.' He told me he loved me and said goodbye."

G.   Serving A Sentence That Began Years Ago

For six years, every moment of Bryant Brown's life has played out against a backdrop of anxiety and grief. He has thought daily of the life he took, and as a result, he has been incapable of fully engaging in his own. "I see his face every day," Bryant says of the ways this incident continues to impact him. He describes seeing people in prison who remind him of Nunez, specifically the way he wore his beard.

If Nunez has been a type of companion through these last six years, a presence Bryant recognizes in the places he finds himself, the opposite is true of himself and the changes he's undergone in that time. When asked what it's like to review the discovery for his case and look at the person he was six years ago, he says, "Honestly I don't recognize that person." In discussing the Facebook messages between Nunez and himself, he points to his own messages and refers to "he," as though he hadn't authored them. When the undersigned mitigation specialist pointed out his reference to himself in the third person, he responds, "I say it like it's not me. That person is unrecognizable."

Since Bryant has been in federal custody, he has had a recurring nightmare. He dreams of being in a confined area -- a hallway, a lobby with no exit -- and the dream begins in the middle of a conflict. He is somewhere and he is arguing with someone, then he is shot. Occasionally, he dreams he is stabbed. When asked what the emotional quality is of these dreams, he says fear.

It is difficult to discern whether the emotional tenor of his dreams is a function of the actions for which he is now taking responsibility, or indicative of his experience being incarcerated during the COVID-19 pandemic. Shortly after Bryant was taken into custody at Metropolitan Correctional Center, a security issue led to a two-week lockdown. Immediately following that, COVID-19 arrived at MCC. By the end of March Bryant was infected with the virus, spiking a fever and losing his sense of taste and smell. He was placed on quarantine, which made information gathering on his health status challenging for both his family and legal team.

Since the pandemic began, Bryant has had one social visit with his son, in August of 2021. He has lost hundreds of hours of access to the law library and meetings with his legal team, and his ability to communicate with his family has been limited by frequent lockdowns and virus outbreaks. He has struggled to keep himself fed and clean as commissary has been limited, and at points the facility has removed any access to media and outside information in the name of security.[14] He has lacked access to clean water, to cleaning supplies, to medical attention. He has been restricted from showering for days on end, and gone weeks without phone access. Since March of 2020, he has had the same two masks that he washes over and over, trying to keep himself from getting sick again.

---

[14] As was the case in June 2020, when nation-wide protests precipitated the following statement from former Warden Licon-Vitale: "As you are aware our nation is facing difficult times as emotions run high and peaceful protests have turned into violently charged demonstrations." Despite there being no evidence of violent demonstrations within facilities, MCC locked down for several days, and individuals were fed only peanut butter sandwiches. In order to get any officer to their unit, someone would have to "pull a medical" – require access to medical staff.

In addition to inhumane standards of living, Bryant has also contended with the prison system's overreliance on solitary confinement as a public health and behavior management tool. Since the beginning of the pandemic, the Federal Bureau of Prisons has reported a 500% increase in the use of solitary confinement.[15] When Bryant was falsely accused of an incident involving an officer, he was immediately removed from his unit and placed in the Special Housing Unit, where he awaited a hearing with the discipline hearing officer. Giving the prison's overreliance on punitive measures, Bryant had to wait thirty days for a hearing, where there was no finding against him and he was cleared of any wrongdoing. He then waited an additional week for a bed on a unit, meaning he spent a total of 37 days in solitary confinement for no reason.

Conditions have been reprehensible, and the manner in which policies are enacted is bewildering. Throughout the pandemic, information from the facility has been communicated sparingly. Lockdown end dates are frequently altered, quarantine periods are regularly extended, and social visits have been scheduled and canceled repeatedly -- perhaps a necessary development, but not without cruelty. Bryant reports the only time information is communicated is when unit managers are walking through and consent to answer questions shouted at them from locked-down units.

To Bryant's mind, the physical and emotional hardship he has experienced is insignificant when compared to the toll it has taken on his children, and his relationship with them. In May 2020, a five-year-old ███ told his mother that he "[doesn't] have a father anymore." A few months later, out of frustration in not hearing from his father due to limited phone access, ███ called 911, believing that the police would be able to put his father on the phone. For a long time, ███ would ask Bryant when he was coming home each time they spoke; ███ has since stopped asking that question. Bryant has already spent more of his daughter's life incarcerated than not, a painful realization that will take decades to correct. During the only visit Bryant has had with his son, ███ peppered him with questions, wanting to see where he slept, what he ate. Following the visit, ███ reportedly walked around for days telling anyone who would listen: "I seen my daddy."

Sadly, physical estrangement from his children is not the only loss Bryant has suffered during his incarceration. In May 2021, Bryant's father Biran died of cancer. Diagnosed the year prior, Biran engaged in treatment and fought for his life, wanting to stay alive to support his son through this ordeal. The loss has been devastating for Bryant's family. They are struggling to come to terms with the loss of the patriarch of their tight-knit family, and also the sole provider. Simultaneously, Bryant is unmoored by his inability to step in to support his family as the eldest born son.

F. Accepting Responsibility

Despite the physical and emotional hardships Bryant has experienced as a result of his incarceration during a global pandemic, he has refused to give in to the grief he feels at spending the next several years of his life in prison. He has worked hard to parent his children from behind bars, and has been a source of support to his family as they move through the pain of his father's death, and his own incarceration. Most importantly, Bryant has actively reckoned with the actions that have brought him before the court.

In the six years since the murder of Albendris Nunez, Bryant has struggled to find the courage to take responsibility for his actions. He has been plagued by what he has done, which has left him incapable of being entirely present in his own life. In his letter to the Nunez family, Bryant refers to his guilty plea as being "the right choice." When asked about that statement, he explained to the undersigned mitigation specialist that while he might have lost at trial and ultimately received a longer sentence, that act would

---

[15] The National Campaign to End Solitary Confinement: Unlock the Box. *Solitary is never the answer, https://unlocktheboxcampaign.org/2021/02/12/solitary-is-never-the-answer/* (last visited September 7, 2021).

specialist that while he might have lost at trial and ultimately received a longer sentence, that act would take something additional from the Nunez family: closure. In accepting responsibility, he is hoping the family can experience closure, and ultimately, some measure of healing.

In pleading guilty, Bryant embarked on the process of mourning his own life, and the ways his actions will echo through the lives of those he loves for years to come. His children will grow up without him present in a substantive way; his partner has already ended their relationship. He did not get to say goodbye to his father before he died, and in the years to come, he will likely lose a great deal more. But even when he takes all that into account, Bryant is still grateful for the opportunity to be held accountable.

In the time he has spent incarcerated, he has also been afforded the opportunity to reflect on his life, the changes he has already undergone, and what he hopes to accomplish in the years to come. "I've changed. It's going to sound crazy, but I'm grateful for this experience. In here, there's peace of mind. I can think. If I hadn't been locked up, I'd probably be dead." It's worth pausing to reflect on the environmental factors for young men of color that would have a Bureau of Prisons facility act as a type of amnesty from life in their community, and Bryant has done just that. When he arrives at his designated facility, Bryant wants to study psychology. With his hard-won perspective, Bryant hopes to counsel young men of color who are dealing with the same environmental and social issues he has struggled with, in the hope that he can help them avoid the two options he felt he had: prison, or death.

## IV. CONCLUSION

Throughout the difficult years Bryant Brown has lived, none have been as devastating as the most recent two. In addition to the standard hardship incarceration carries with it, Bryant has suffered through a global pandemic that cannot be treated as a neutral factor in his sentencing. "The trial judge cannot close his or her eyes to the conditions a particular defendant being sentenced will necessarily experience in prison.... the prison environment must be considered by the sentencing judge in estimating total harm and benefits to prisoner and society—a utilitarian as well as a compassionate exercise."[16] As the delta variant flares across the country and flourishes in correctional settings, his access to social supports and the impact on his long-term physical and mental health must be weighted in the sentencing calculus.

As Bryant struggles to wrap his mind around the length of time he will spend incarcerated, he continues to invest in his life. Within the prison, he works as a companion for individuals on suicide watch, offering community and connectivity. He calls his children constantly, desperate to remain an active part of their lives rather than a passive memory. He thinks about his future, and he plans for it.

In the brutal months he has spent incarcerated, Bryant Brown has demonstrated his capacity for change – just as he did as an adolescent in Africa, just as he did when he thrived in Pennsylvania. He has transmuted the pain of this experience into an understanding of what he's done, and an empathy for those he impacted. It is with the factors that have led him to this place and the change that has already occurred that a below guidelines sentence is respectfully requested.

Thank you for your thoughtful consideration of this matter and the information shared above.

Respectfully,

Lauren Harris, LMSW

---

[16] *United States v. D.W.*, 198 F.Supp.3d 18, 23 (E.D.N.Y. 2016).

# APPENDIX A

Curriculum Vitae
Lauren Harris, LMSW

**Lauren Harris**
4 South Orange Avenue, #315 • South Orange, NJ 07079
lauren@harrismitigation.com

<u>**Process**</u>
Experienced criminal defense social worker with proven ability to craft sentencing memoranda to achieve optimal outcomes for clients. Holistic process utilizes knowledge base from years in forensic social work and skills honed during two decades as a writer and editor:

- Client Interaction: Conduct comprehensive interviews with clients, drawing on clinical assessment skills and a depth of knowledge on issues including but not limited to mental health, developmental delays, trauma, substance abuse and adolescent brain development.
- Collateral Contact Development: Engage and interview collateral contacts to inform sentencing memoranda, enumerating social factors that provide additional context for the client's interaction with the criminal justice system.
- Record Integrity, Research and Case Planning: Locate and digest all manner of client records, providing insight on contents and subsequent connections to case theory. Research and contact potential programs and resources to craft treatment plans.
- Written Analysis: Integrate interviews, assessments and record diligence into a comprehensive memoranda, conveying the complexity of the client's circumstances and offering up mitigating factors and/or non-incarceratory alternatives.
- Presentation and Engagement: Present findings to attorneys, judges and other relevant parties in court proceedings and stakeholder meetings.

<u>**Education**</u>
**Columbia University**, New York, New York
M.S.W., May 2011
Editorial Board Member, *Columbia Social Work Review*; Member, Criminal Justice Caucus

**New York University**, New York, New York
B.A., English Literature and Journalism, May 2003

<u>Certifications</u>
Licensed Master Social Worker (L.M.S.W.), New Jersey, August 2018

Seminar in Field Instruction (S.I.F.I.) Certificate, May 2014, Columbia University, New York, New York

<u>**Experience**</u>
**The Bronx Defenders**, Bronx, New York
*Criminal Defense Practice Social Work Supervisor*, February 2014 - October 2016
*Criminal Defense Practice Social Worker, Adolescent Defense Practice*, December 2012 - February 2014
*Criminal Defense Practice Social Worker*, September 2011 - December 2012

Managed a caseload of 50 criminal defense practice (CDP) clients charged with misdemeanors and felonies. Informed case theory and legal strategy as a collaborator on interdisciplinary teams that included advocates in criminal, civil and family law practices to reach optimal dispositions. Conducted comprehensive interviews and built rapport with clients -- oftentimes beginning at arraignment -- and maintained relationships throughout the pendency of the case. Identified and interviewed collateral contacts, and acted as a liaison between legal team and those contacts. Located records and synthesized findings with current research to author pre-pleading investigation reports and sentencing memoranda. Created tailored service plans and calibrated creative solutions for advantageous case resolutions. Initiated and maintained daily contact with clients, clients' family members, judiciary and Bronx District Attorney's staff, program representatives, correctional counselors, discharge planners and records keepers. Created specialization in working with adolescent clients charged as adults. Provided weekly individual supervision to 10 CDP social workers. Facilitated bi-monthly practice meetings. Reviewed and provided feedback on social

**Lauren Harris**
4 South Orange Avenue, #315 • South Orange, NJ 07079
lauren@harrismitigation.com

workers' written advocacy and oral advocacy in court. Conducted interdisciplinary training of new CDP social workers. Participated in the Client Emergency Fund.

**The Osborne Association**, Brooklyn, New York
*New York Initiative for Children of Incarcerated Parents - Televisiting Coordinator*, May 2011 - August 2011
*New York Initiative for Children of Incarcerated Parents - Social Work Intern*, September 2010 - April 2011

Managed 20-person caseload and initiated pilot televisiting program with Albion Correctional Facility to enable children to speak to their incarcerated mothers. Counseled clients, caregivers and family members, adapting televisits to provide emotional support. Utilized research techniques to develop and implement intake and assessment tools. Researched and prioritized information to develop a resource list for client referrals. Participated in youth field trips to correctional facilities and recreational sites. Provided organizational support for 300-person New York Initiative for Children of Incarcerated Parents First Annual Summit. Corresponded with government agencies to assist incarcerated individuals with program access.

**Selfhelp Community Services**, Brooklyn, New York
*Nazi Victims Program Social Work Intern*, September 2009 - August 2010

Managed a caseload of 15 elderly Holocaust survivors. Conducted client home visits and biannual individual assessments of psychosocial and financial status. Facilitated client applications for services and arranged provision of these services. Wrote grant requests and received $5,000 for clients' needs. Provided supportive counseling, emergency concrete assistance, crisis intervention and client referrals. Maintained case notes and statistical reports.

**Additional Information**
"Written Advocacy Series: Interviewing for Narrative" Presented at The Bronx Defenders Staff Training, 2019
"Interviewing Adolescents: Concrete Skills Informed by Cultural Humility and Emerging Neuroscience Research" Presented at the National Organization of Forensic Social Work, 2015

**VH1.com**, New York, New York
*Music Editor*, January 2007 - December 2008

***Blender Magazine,*** New York, New York
*Assistant Editor*, May 2003 - January 2007

# APPENDIX B

Student Transcript from West Scranton High School

**9/11/2012**

## Student Transcript

Page  1 of 1

To: Byrant Brown
   1001 W Lackawanna AVE
   Scranton, PA 18504

From: West Scranton High School
   1201 Luzerne St.
   Scranton, PA 18504

Mr. Robert Gentilezza

CEEB #:  394455

| | |
|---|---|
| **Student:** Brown, Byrant | **Phone:** |
| **Birth Date:** 1994 | **Grade:** 12 |

**Social Security:**
**Graduation Date:** 6/10/2013

**Year:** 2009-10          **Grade:** 09
**Building:** Bronx Studio School for Writers & Artists, Bronx, NY
   10459

**Year:** 2010-11                                      **Grade:** 10
**Building:** Bronx Studio School for Writers & Artists, Bronx, NY
   10459

| Course | Final | Credit | Course | Final | Credit |
|---|---|---|---|---|---|
| English 1 | 68 | 0 | English 2 | 55 | 0 |
| World Cultures | 55 | 0 | Global Cultures | 55 | 0 |
| Algebra 1 | 65 | 0 | Geometry | 55 | 0 |
| Envir.Studies | 70 | 1 | General Science | 65 | 0 |
| Phys Ed 1 | 81 | 0.25 | P.E.2 | 89 | 0.25 |
| Health 1/2 | 81 | 0.4 | Health 3/4 | 80 | 0.4 |
| **GPA:** 0.0000 | **Credit:** | 1.650 | Art 1 | 55 | 0 |
| | | | **GPA:** 60.0442 | **Credit:** | .650 |

**Year:** 2011-12          **Grade:** 11
**Building:** West Scranton High School

| Course | Final | Credit |
|---|---|---|
| Safety | 94 | 0.2 |
| Spanish 1 | 65 | 0 |
| Drafting 2 | 83 | 1 |
| Biology | 65 | 0 |
| English 3 | 64 | 0 |
| Amer History II | 61 | 0 |
| Health | 80 | 0.4 |
| Algebra II | 76 | 1 |
| Phys Ed 3 | A | 0.25 |
| **GPA:** 70.4242 | **Credit:** | 2.850 |

| Type | GPA | Rank |
|---|---|---|
| Unweighted | 70.4242 | |
| Weighted | 70.4242 | 255 / 272 |

**Total Credit:** 5.150

*Paul Ment*

GUIDANCE COUNSELOR

9/11/12

DATE

# APPENDIX C

## Letters from Bryant's Family and Community

- Chanel Laye, mother
- Samantha Suarez, former partner
- Cynthia Brown, great aunt
- ██████ Laye, brother
- Patricia Laye, sister
- ██████ Laye, sister
- Yvette Carrasquillo, former partner's mother

The Honorable Paul A. Engelmayer

United States District Judge

United States Courthouse

40 Foley square

New York New York 10007


Greetings your honor, my name is Chanel laye, I am a stay at home mom or 6 and a grandmother of 5. I am blessed to say I am the mother of the defendant Bryant Brown who is my eldest child. I had Bryant at the age of 15, growing up Bryant was well taken care of and was put on a path of success by both me and his late father Biran laye. As a child Bryant was always happy very smart and caring always putting others first was his specialty especially his siblings and children. I can recollect multiple occasions when Bryant gave his last to make sure everyone around him was okay even when he was not. Hearing my son admit to the unlawful crimes committed broke me down being that I raised him to be better that that. However these crimes do not define Bryant as a person Bryant is a good kid that got himself caught up with the wrong crowd and interests. Anything Bryant does is for his family even if it means having to put himself at risk when Bryant found out he was having his children he knew he had to do what he had to to provide for his family one quality Bryant has is the fact that he is a go getter but if that quality is used in the wrong way it can result in wrong doing. Bryant is very educated and was always into many extracurricular activities such as rugby football, MMA and, was always an honorable student.

As of May 2018, the month of May haven't been as bright as the sunshine of springtime. May 30, 2018 Bryant turned himself in and from there everything has been depressing. As time went by, 2019 was Bryant's first court date and my husband was with mw and was able to attend and support our son in court. By the time of Bryant's next court date in 2020, my husband was diagnosed with stage 4 stomach cancer and suffered from being in and out of hospitals and being at his lowest of the low. Unfortunately at the time of Bryant's court date in 2020 my husband was in the hospital. Fast forward to the next devastating year, 2021. May 20th 2021 my husband Biran's legacy was washed away with his passing. As a father, husband, brother & son anyone could tell you he put those titles as his first job and priorities. with him around no one had to worry for anything and always had a smile on their face from his energy that my family cherished until his last breath. As of Bryant's last court date my husband was on his last days. My husband's passing wasn't only devastating but he brought in multiple blessings. My daughter gave birth to my new beautiful granddaughter, named ▮▮▮▮▮▮ However it's double trouble being that my eldest daughter is 7 months pregnant with another granddaughter to welcome to the crew. Although we are all grieving every day from the loss of the man of our family we hold on to the memories that made us love him most.


As a mother I believe that everyone deserves a second chance especially someone like my son that I know won't ever take life for granted after this.

The Honorable Paul A. Engelmayer

United States District Judge

United States Courthouse

40 Foley square

New York New York 10007

My name is Samantha Suarez First and foremost I would like to thank you for giving me the opportunity to write this letter to you on behalf of Bryant brown who I have known for eight years and share two children with. I was troubled and surprised to hear my boyfriend admit to such a horrible crime because I know he was raised better than that. Although Bryant may not have grew up having everything he ever wanted I believe his parent did the best to give him everything he needed. For as long as I have known Bryant he has always been a solid, respectful and caring, individual who is always willing to put people before himself no matter who is was. Bryant was always a great helper in his community and was always willing to help anyone in any way he can. To me Bryant is more than just my partner but also my best friend for as long as we have been together Bryant has always been supportive and always there for me even when I was at my worst. One thing that caught my attention when I met Bryant was how smart and amazing of an individual he was and he has such a great heart I remember when we found out I was pregnant with our son his face lit up you can tell he was so happy while I was in tears because I was afraid I did not know what to expect I was twenty years old at the time and I remember his looking at me and telling me " we are going to be okay I promise" and he held me until I was okay. Bryant always knows how to calm me down even with him not physically here anytime I'm going through anything and I speak to him I feel so much better. Bryant is such an amazing father to our children I remember him always making sure he would be up in the morning just to help me get our kids together just

so he can drop off our son at school and go back home to stay with our daughter who was a baby at the time while I went to work. I remember night time feedings we would always take turns getting up is was the best thing I could of ever had was such great support something a lot of females at my age really did not have. I remember our daughter would be up for hours at night screaming crying because she had so much gas and Bryant would make it his business to stay up with her and help her till she was ok our daughter is such a daddy's girl he face always lights up when she speaks to him although I know all this are things a father should do for his children but growing up in this generation a lot of young parents were not blessed to have the support of their significant other and, Bryant did it without a complaint in the world and I appreciate that about him since Bryant has been gone things have been a struggle because although I have his families support it's not the same as having him physically here. I understand the seriousness of this matter however hope the court will show some leniency if there is anything I've learned in life is that time is the most valuable thing in life besides life itself; time loosed is something you can never get back. All I hope for is for him to be able to come home and have time to be a father to our two children because throughout this whole process they are the ones who have been hurting the most and I see it first hand on a daily bases. I believe that as we move forward he will emerge into an even better person because people make terrible decisions all the time but those decisions do not define who we are as people. It is my sincere hope the court takes this letter into consideration, I still believe Bryant to be an honorable person and a valuable member to his family as well as the community.

The Honorable Paul A. Englemayer
   United States District Judge
   United States Courthouse
   New York, New York 10007

My name is Cynthia Brown and I am the matriarch of our family. I am writing this letter on the behalf of my great-nephew Bryan Brown. I want to start off by giving my condolences and sympathy to the young man's family for the death my nephew has caused. I have never known Bryan to be violent or hurt anyone. As a small child Bryan did not have, what we call a hand problem. He did not strike other children. He was friendly and playful. Bryan has always been a fun, respectful, caring loving child and adult. He was never a troubled kid or adult. He loved playing sports. I can't remember one time seeing Bryan become disrespectful or angry. He always wore a big bright smile, and love to make others and our family laugh. When I would visit Bryan and his family he always greeted me with the words "hi auntie". He would hug me, kiss me on my cheek and ask me how I was feeling. This is how he and all the kids greet their elders in our family. He was always a good son, grandson, nephew and big brother. He has a great character. He's a person others loved to be around. He was raised in a home by his parents, and was instilled with values on how to treat others and work a work ethic . He worked on a job alongside his late father Byran Laye at a dealership. His father took him and his sister to Africa to visit their grandparents and to learn about their African heritage. He came home and was telling his experience to his grandmothers and the rest of the family.  We was all at my moms house visiting her one weekend and the smaller kids was having a disagreement, and Bryan intervened and sent them in the house and told the two cousins to have a seat and don't get up until he told them to. He told them if they couldn't get along than they didn't need to play. He and his long-time girlfriend Samantha has a daughter and son they were raising together. I have to say they were doing a good job raising there two young children as a young couple. Bryan showed effection to his kids and was teaching them the value of morals, respect and education. Bryan comes from a very large family of aunts and older cousins. He has a older cousin name Chavonne, who he adores and she also taught Bryan right from wrong. The bond he has with his cousin can't be broken.  He is the fifth generation of our family. We his family instilled values in Bryan. This is why our family was shocked in hearing about his crime. This is not the Bryan we know. He knows the value of family and how proud we are of our family. He had a great grandmother, grandmother, aunt, and uncle who he adored. There was nothing Bryan would not do for his grandmother. When his grandmother became sick with cancer, he was one of her right hand. He was terribly hurt by her death. I'm sure my nephew has learned from his tragic mistake. For when he took a life he took his life also. He did not get to say good-bye to his dying father, he did not get to hug him, kiss him and show his dad his beautiful smile for the last time. He can not ask his children what is wrong when they cry, and he will miss that first graduation. My nephew has admitted to his crime, which means he has accepted his responsibility in the death of the young man. He will live with this tragedy for the rest of his life. The first step in healing is admitting to what you have done wrong. My hope for my nephew is to take the time he will spend in prison to reflect on his wrong, and to come home and be a positive role model for others and a better man than he was.

Sincerely,
Cynthia Brown

Case 1:20-cr-00012-PAE   Document 110   Filed 09/21/21   Page 39 of 47

The Honorable Paul A. Engelmayer
United States District Judge
United States Courthouse
40 Foley square
New York New York 10007


My Name is ███████ Laye, I am Bryant's younger brother, although everyone looks at
my brother as a criminal, I just see my older brother Who was always there to take me to school
and play video games with me. Bryant is everything to me; I always looked for him when I need
advice and guidance as a child. He is the last of men I got to look up to now that my father is
gone. When Bryant was young he was very athletic he was always involved in multiple sports
such as rugby, Basketball and, MMA, when we lived in Pennsylvania Bryant was always outside
staying active working out when he had nothing else to do. When we made the move back to
New York I feel like that's when a lot changed I began to spend less time with my brother and
any time that we did spend it was very much worth it. I pray every day for my brother to come
home I am aware that what he did was very wrong and, no punishment at all is not something I
want to ask, but what I do ask is that my brother to be given a second chance at life because I
know he will make it the best one. I would like to also give my condolences to the victim's
family because no one should ever bear the pain of loosening a loved one. Everyone makes
mistakes in life and I know my brother is very remorseful towards the situation and I pray that he
gets a fair sentencing. Thank you for taking the time out your day to read my letter.

To the Honorable Paul A. Engelmayer
United States District Judge
United States Courthouse
40 Foley Square
NY,NY 10007


Greetings Your Honor I hope all is well. My name is Patricia Laye. I am blessed and pleased to say that I
am one of Bryant Brown's younger sisters. Growing up Bryant was always my protector and played his
role as my big brother very well. Bryant always made sure that we knew he was a reflection of his family
as the eldest child of our parents. Bryant is the definition of a family man. Despite his siblings, Bryant
would strive and sacrifice everything he has for his kids. Unfortunately that characteristic put him in the
predicament that he is in now, which I am fully aware of the unlawful actions Bryant has taken. Yes I am
disappointed however this mistake shouldn't define Bryant as a person because everyone who knows him
knows he is a caring , respectful, and honest person. I remember a time growing up when I used to argue
with my mom and siblings to a point where it was disrespectful and Bryant came to my moms house to
talk to me. When he spoke to me, not only did he check me about where I was wrong but he also listened
to how I felt and understood me more than anyone ever did. I was an angry person and when Bryant
spoke to me on multiple occasions he was my relaxer in a way. This just goes to show that Bryant wants
the best for everyone around him and actually cares to go out his way to make sure of it. On ▆▆▆▆ I
gave birth to my beautiful baby girl ▆▆▆▆. I can recollect when Bryant found out about my pregnancy
like it was yesterday. He was ecstatic. Every time I got the chance to speak to him throughout my
pregnancy he always was so curious about how everything was going and if I was okay mentally and
emotionally. Bryant was supportive through everything even being incarcerated. He just loves to see his
family grow and I believe he deserves every right to see it full on. With that being said, when Bryant is
set as a free man I will guarantee that change will happen. I believe that this is a learning experience for
Bryant and he will change for the better for the sake of his family. I send all condolences to the
victim's loved ones. Thank you Your honor for giving Bryant and his loved one the opportunity to write
these letters on behalf of him and thank you for accepting his plea. I hope this reflects with positivity.


Sincerely,

Patricia Laye

The Honorable Paul A. Engelmayer
United States District Judge
United States Courthouse
40 Foley square
New York New York 10007


My name is ▓▓▓ laye and I am Bryant's youngest sister We probably see two different Bryant Browns when I see Bryant I see a family man someone that would do what he has to just to make sure his family is okay I know you probably hear that a lot but I truly mean it Bryant has always been there for me I remember when I was in second grade and I had a school trip and all my friends parents were going and at the time my mom and dad were busy and was not able to attend the trip with me which made me sad my brother Bryant made it his business to cancel all his plans and go with me on my school trip although I know that may not seem like much but it meant a lot  to me. I think one of my favorite things about my brother is he always puts other people before him even people who don't deserve to be I know what he did was wrong but I don't want that mistake to define him as a person I remember a few years ago when me Bryant my younger brother and Samantha took a road trip to swap cars for my dad's job and I remember how much fun I had because Bryant always knew how to make people laugh and have a good time. I remember writing Bryant a letter just telling him about everything I was going through in life and weeks later he wrote back I had just came from my aunt's house and my mom handed me the letter from him I was excited because at the time I was 15 and I never received mail in my life but also because I couldn't wait to see what he had to say. I remember him telling me he couldn't believe I was 15 years old and the last time he seen me I was 11-12 years old he also apologized for not doing the right things and not being there for me the way he should to watch me grown into the young lady I am turning into today. I just hope my brother will be home to see me graduate college because I know that would mean a lot to him as well as me.

7/2/2021

To: Honorable Paul A. Engelmayer

United States District Judge

United States Court House

First, I will like to thank you for the opportunity you are giving me to give you a more understanding and insight on who is really Bryant Brown. My name is Yvette Carrasquillo, I am the mother to Samantha Suarez, I am also the grandmother to the children Bryant and my daughter share.

This letter is to urge the leniency in the sentencing of Bryant Brown. I feel like I speak for everyone when I say. We are fully aware of the gravity of the crime Bryant is being convicted of. It is also very hard for us all to wrap our heads around. This whole ordeal has had a lot of effect on everyone. I hope one day we can all put this behind us and try to go back to some kind of normality.

I have known Bryant Brown for 7 years. In those 7 years I have seen a good father that tried his best for his children. This is not the man we have all known and love. Over the years of knowing Bryant, He has always been very quiet and humble. I instantly made a part of the family. He is like a second son to me. Bryant has always been a kind person that has always been there for his family. He has always been willing to lend a helping hand to anyone who needed it. He has always had great respect for his elders. He enjoyed cooking little things like bake ziti for the family. I know his children adore him and miss him very much. Since he has been away things have not been the same for his children. We all miss and worry for him.

One thing My mind always takes me to when I think of Bryant, is the children's Birthday parties. Bryant always seem to enjoy those parties. He spent his time Manning the grill making sure everyone ate and was happy. He always did it with a great big smile and great pleasure. I miss that smile! He always played games with all the kids and handed out prizes to all, even the ones who didn't win. I know that Bryant didn't have the childhood he wished, but I know he wanted to give his children better. His children are the most important thing to him. All he ever wanted and still wants is to be part of his kids life. Even though he is away he still makes sure to be

active in his children life. Bryant is good person with a good heart. He is greatly missed by many.

I will like to end my letter by saying  This situation has no benefits to anyone or everyone involved. I really do hope and pray that Bryant someday soon gets the real time with his children Thank you again for the time you are taking out of your busy schedule to understand more of who is Bryant Brown?

Sincerely,

Yvette carrasquillo

# EXHIBIT 3

08/17/21

Dear Nunez Family,

I want to start this letter by saying
I'm sorry for all the pain and hurt I've
caused to your family.

In the months I have been incarcerated
I have again and again wanted to
find a way to make my heartbreak and
regret known. The loss for your family is
so huge and lasting that I stumble over
even starting to add it up. A young
man who had decades of accomplishments
and milestones ahead of him, and who
had roles to play in your lives that
while I can't know I also cannot
help but imagine, was lost in such a
senseless act. I know that there could
never be enough apologies to take back the
damage and right the wrong I've caused
to your family. Often I've wished for
a chance to make reparations, to write
a thousand times about my sorrow
and humiliation for having been responsible
for what happend.

The Shame I feel is Constant. I look at my hands and want to step out of this body that was responsible for an act that I would never have expected to be a party to. I was grateful to be able to plead guilty and although it was a difficult task at first, I know now it was the right choice to make and will hopefully give you closure. Signing the guilty plea was a way of making these hands serve justice. I constantly try to put myself in your shoes and when I imagine losing a loved one, I cry. I went into the shower stall of the institution I reside and I cried because of the hurt I feel and I know this feeling isn't even a quarter of what your feeling or going through. I hate myself for even being the person responsible for what happend.

It is understandable that I may be the absolute last person you want to hear from. If that is the case I of course respect that. I will say that I am powerfully grateful for the ability to tell you how much I regret what

I was responsible for and not because I'm incarcerated but because I took away a man who carried the names of brother and son from people who relied on him. Please know your family is in my prayers daily and I wish wellness and closure for your family. Your loss is the biggest regret of my life and I hope my pleading guilty gives closure to your family.

Sincerelly,
Bryant Brown